UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SEAN E. MCMAHON,

                                        Plaintiff,

v.                                                           5:10-CV-1063
                                                             (GHL)

OFFICER FURA, OFFICER PATTI,
OFFICER SUMMERS,
CITY OF SYRACUSE,

                                        Defendants.
_____

APPEARANCES:                                    OF COUNSEL:
MEGGESTO, CROSSETT & VALERINO, LLP               JAMES A. MEGGESTO, ESQ.
Counsel for Plaintiff
313 E. Willow Street, Suite 201
Syracuse, New York 13203

MARY ANNE DOHERTY, ESQ.                          JAMES P. MCGINTY, ESQ.
Corporation Counsel for the City of Syracuse     SHANNON T. O'CONNOR, ESQ.
Counsel for Defendants
300 City Hall
Syracuse, NY 13202


GEORGE H. LOWE, United States Magistrate Judge

### MEMORANDUM DECISION AND ORDER[1]

        In this action, Plaintiff Sean E. McMahon contends that Defendant City of Syracuse

Officers Patti, Fura, and Summers[2] arrested him for violating an unconstitutional city ordinance

and used excessive force in effectuating that arrest in violation of state and federal law.  (Dkt.

_____

        [1]        This matter is before the Court by consent of both parties.  (Dkt. No. 25.)

        [2]        Defendant Officers Carns, Cope, Novitsky, and Tassini were dismissed from this
action with prejudice with Plaintiff's consent.  (Dkt. No. 21 at 2.)

No. 1.)  Currently pending before the Court is Defendants' motion for summary judgment.  (Dkt. No. 33.)  Plaintiff has opposed the motion.  (Dkt. Nos. 38-42.)  Defendants have filed a reply. (Dkt. No. 45.)  For the reasons discussed below, Defendants' motion is granted in part and denied in part.

## I.     FACTUAL AND PROCEDURAL SUMMARY

The facts in this case are, unless specifically noted, undisputed.

On June 15, 2009, the Syracuse Police Department assigned four units from the Crime Reduction Team to the evening shift on the west side of the City of Syracuse, specifically the area of Tallman and Rich Streets.  (Dkt. No. 33-14 ¶ 1; Dkt. No. 39 ¶ 1.)  The Crime Reduction Team is comprised of two-man units assigned to an area of the city where there is a need for increased police presence due to high crime.  (Dkt. No. 33-14 ¶ 2; Dkt. No. 39 ¶ 1.)  The four Crime Reduction Team units patrolling the west side of the City of Syracuse on June 15, 2009, were unit 524 (Officers Fura and Summers), unit 525 (Officers Patti and Copes), unit 527 (Officers Murphy and Novitsky), and unit 528 (Officers Carns and Tassini).  (Dkt. No. 33-14 ¶ 4; Dkt. No. 39 ¶ 1.)

Defendant Officer Patti and Officer Cope responded to a gambling complaint in the area of Onondaga Avenue and Rich Street.[3]  (Dkt. No. 33-14 ¶ 5; Dkt. No. 39 ¶ 1.)  After addressing the gambling complaint, Defendant Patti and Officer Cope sat in their police car and watched a crowd[4] of people on the sidewalk of Tallman and Rich Streets.  (Dkt. No. 33-14 ¶ 6; Dkt. No. 39

[3]     Defendants do not assert that this gambling complaint had any connection with Plaintiff or with the group of people with whom he was associating.

[4]     Plaintiff objects to the word "crowd."  Plaintiff states that the "term crowd is subjective at best, and in fact, there were only five (5) individuals standing on the sidewalk at the

p 2.)  Officers Carns and Tassini also responded to the crowd gathered on Tallman Street.  (Dkt. No. 33-14 ¶ 7; Dkt. No. 39 ¶ 2.)  Defendant Patti observed that a member of the One Ten gang was among the crowd.[5]  (Dkt. No. 33-14 ¶ 8; Dkt. No. 39 ¶ 2.)  Plaintiff was with the group. (Dkt. No. 33-14 ¶ 4; Dkt. No. 39 ¶ 1.)

Multiple units of the Crime Reduction Team approached the group gathered on the sidewalk on Tallman Street.  (Dkt. No. 33-14 ¶ 9; Dkt. No. 39 ¶ 1.)  When the officers approached the group, Plaintiff immediately started to run away.  (Dkt. No. 33-14; Dkt. No. 39 ¶ 1.)  Officer Cope, Officer Novitsky, and Defendant Patti chased Plaintiff, yelling at him to stop and that he was under arrest.  (Dkt. No. 33-14 ¶ 13; Dkt. No. 39 ¶ 1.)  Plaintiff ran from police[6] and the police chasing him on foot were five to six blocks behind.  (Dkt. No. 33-14 ¶ 11; Dkt. No. 39 ¶ 3.)  Plaintiff did not respond to the verbal commands to stop running.  (Dkt. No. 33-14 ¶ 17; Dkt. No. 39 ¶ 1.)

Defendant Officers Summers and Fura were in their police car when they received a call over the radio about a foot pursuit.  (Dkt. No. 33-14 ¶ 14; Dkt. No. 39 ¶ 1.)  Defendants Summers and Fura saw a person running across Onondaga Street with police officers chasing behind him.  (Dkt. No. 33-14 ¶ 15; Dkt. No. 39 ¶ 1.)  Defendants Summers and Fura responded to the call.  (Dkt. No. 33-14 ¶ 16; Dkt. No. 39 ¶ 1.)

Plaintiff was running across the street with the officers chasing behind him when

---

corner of Tallman and Rich Streets . . . ."  (Dkt. No. 39 ¶ 2.)

[5]     Defendants do not assert that Plaintiff is a member of the One Ten gang.

[6]     Plaintiff admits that he "did, in fact, run" but asserts that "the allegation that he ran 'from police' is subjective."  (Dkt. No. 39 ¶ 3.)

Defendants Summers and Fura turned their police car down Onondaga Street.  (Dkt. No. 33-14 ¶ 18; Dkt. No. 39 ¶ 1.)  Defendant Fura gave Plaintiff verbal commands to stop running from the police car.[7]  (Dkt. No. 33-14 ¶ 19.)  On Fitch Street, Defendant Fura attempted to pull the police car onto the sidewalk to block Plaintiff's path and make him stop, however Plaintiff ran around the car and continued to run.[8]  (Dkt. No. 33-4 ¶ 20.)

Defendants Fura and Summers exited their car and were able to catch Plaintiff.  (Dkt. No. 33-14 ¶ 21; Dkt. No. 39 ¶ 1.)  At his deposition, Defendant Fura testified that when he caught up with Plaintiff:

> A:  I grabbed the back of his shirt and attempted to pull him back. He pulled forward, at which time I delivered a strike to his right jaw area, and we both ended up falling to the ground, forward.
> Q:  And did you say anything to him?
> A:  I told him to put his hands behind his back.  He was under arrest.
> Q:  What was he under arrest for, if you know?
> A:  At this time he was going to be under arrest for disorderly crowd.
> Q:  But you didn't know that at the time?
> A:  I didn't know specifically what the charge was.
> Q:  You told him he was under arrest, but you didn't know for what violation?  Is that your testimony?
> A:  Correct.

(Dkt. No. 33-12 at 6:8-24.)

At his deposition, Defendant Summers testified that:

---

[7]     Plaintiff denies this fact, citing to his deposition transcript.  (Dkt. No. 39 ¶ 4.) The cited portion of the deposition transcript states: "Q: . . . You said you don't have a clear recollection of what happened when . . . the police came in contact with you; is that a fair statement?  A: Yes." (Dkt. No. 33-9 at 15:20-24.)

[8]     See note seven.

A:      Officer Fura grabbed a hold of - - got close to Mr. McMahon and grabbed a hold of him, and he pulled, and when he did, from what I can tell, I seen Mr. McMahon spin around and then go to the ground.

Q:      You say you saw Officer Fura grab Mr. McMahon?

A:      Well, his shirt. Clothing. Something of that nature. Because he pulled, and then he spun around. Like, he slipped out of his grasp or slips out of - - but I just seen him spin around.

Q:      Did he get grabbed from the front or from behind or from the side?

A:      As I'm coming around the car - - I coul[d]n't tell you. I know he was running. We were behind him, so it was either from the side, backside or something, because when he did, he went around like that, and he rolled into the - - so I'd say it would have to be from the backside area.

Q:      And Mr. McMahon ended up on the ground?

A:      That's correct, sir.

Q:      What action did you take then?

A:      At that time I came around, and Officer Fura was trying to grab a hold of him. Mr. McMahon was pushing to get off the ground to get free again. He was advised to stop resisting and get on the ground and place his hands behind his back, at which time he didn't comply with that at all. I placed a strike to the shoulder blade to collapse the shoulder down to get on the ground so I can handcuff him. He continued to push off. I applied another strike. The strike hit the top of the shoulder, bounced off and cut his eyebrow.

Q:      What happened next?

A:      At that point in time we were finally able to get him down on the ground and forcefully put his hands behind his back and get him cuffed, and that's when I noticed the weed in his hand, as I pulled his hand behind his back. I had to forcibly remove the marijuana from his hand.

Q:      That was after he was handcuffed?

A:      That was while he was handcuffed. Yes, sir.

(Dkt. No. 33-10 at 9:15-11:5.)

The unverified complaint, signed only by counsel, alleges that:

Defendant Fura punched Plaintiff in the face with his right fist causing the Plaintiff to fall to his stomach. Due to the strike, Plaintiff fell and hit his head on the pavement and sustained

numerous injuries on his face and hands.  While still lying face [ ] down, Plaintiff tried to move, and Officer Summers struck him near his left eyebrow again causing Plaintiff to sustain injuries. Defendants claimed Plaintiff was trying to resist and therefore . . . Defendant Fura and Defendant Summers punched Plaintiff again in his face and body.  They then forcefully placed Plaintiff's arms behind his back and handcuffed him.

(Dkt. No. 1 ¶¶ 8-10.)

Despite the allegations in the unverified complaint, the evidence developed during discovery shows that Plaintiff does not recall the actual stop by police.  (Dkt. No. 33-14 ¶ 22; Dkt. No. 39 ¶ 1.)  Plaintiff remembers running from police and the sound of sirens behind him. (Dkt. No. 33-14 ¶ 23; Dkt. No. 39 ¶ 1.)  At his deposition, Plaintiff testified that "the one officer in the car, he tried to cut me off as I'm running, and I believe he was trying to run me over . . . All four of the wheels busted or sounded like four of the wheels busted, and then . . . that's when I believe I was tased."  (Dkt. No. 33-9 at 14:3-9.)  At his 50-h hearing, Plaintiff testified "I just remember it felt like I was being electrocuted . . . So I must have been tased by . . . an officer." (Dkt. No. 33-8 at 23:23-24:18.)  At his deposition, Plaintiff testified that he believed he had been tased because his "whole body shut down," but that he does not remember when that happened. (Dkt. No. 33-9 at 17:9-15.)  Plaintiff remembers hitting the ground but does not remember what happened to make him fall.  (Dkt. No. 33-9 at 15:5-15.)  That is all that Plaintiff recalls before waking up in the hospital.  (Dkt. No. 33-14 ¶ 24; Dkt. No. 39 ¶ 1.)  Plaintiff does not recall the contact that he had with police once they were able to catch up with him.  (Dkt. No. 33-14 ¶ 25; Dkt. No. 39 ¶ 1.)

Neither Defendant Summers nor Defendant Fura was armed with a taser on June 15,

6

2009.[9]  (Dkt. No. 33-14 ¶ 28; Dkt. No. 33-12 at 7:4-6.)  Defendant Patti was armed with a taser, but testified at his deposition that he did not use it.  (Dkt. No. 33-11 at 21:3-22:1.)  Defendant Fura arrested Plaintiff.[10]  (Dkt. No. 33-14 ¶ 29.)  Defendant Patti did not arrest Plaintiff.[11]  (Dkt. No. 33-14 ¶ 30.)

Rural Metro took Plaintiff to the hospital.  (Dkt. No. 33-14 ¶ 27; Dkt. No. 39 ¶ 1.) Plaintiff was released from the hospital at about 2:00 a.m.  (Dkt. No. 33-8 at 27:19-21.)  He got a ride home from a friend.  *Id*. at 27:24-25.  Plaintiff was never lodged in the Justice Center.  *Id*. at 28:1-3.

Plaintiff was issued appearance tickets for unlawful possession of marijuana, resisting arrest, and for violating the City of Syracuse's disorderly crowds ordinance.[12]  (Dkt. No. 33-14 ¶ 31.)

The unverified complaint, signed only by counsel, alleges that "[t]he Honorable Vanessa Brogan dismissed all criminal charges against the plaintiff."  (Dkt. No. 1 ¶ 17.)  There is no evidence in the record before the Court either confirming or casting doubt on that assertion.

Plaintiff filed a notice of claim with the City of Syracuse on September 1, 2009.  (Dkt. No. 33-5.)  Plaintiff listed the nature of his claim as "[f]alse arrest, false imprisonment, excessive force, police brutality, violation of claimant's civil rights, and assault."  *Id*.

---

[9]      See note seven.

[10]     See note seven.

[11]     See note seven.

[12]     Plaintiff admits that he was issued appearance tickets, but notes that he was charged with marijuana possession five minutes after being charged with the other two offenses. (Dkt. No. 39 ¶ 6.)

Plaintiff filed his complaint in this Court on September 2, 2010.  (Dkt. No. 1.)  The complaint asserts the following causes of action: (1) a 42 U.S.C. § 1983 false arrest claim against Defendants Fura, Patti, and Summers; (2) a 42 U.S.C. § 1983 excessive force claim against Defendants Fura, Patti, and Summers; (3) a state law false imprisonment claim against Defendants Fura, Patti, and Summers; (4) a state law assault claim against Defendants Fura and Summers; (5) a state law negligence claim against Defendants Fura, Patti, and Summers; (6) a claim against the City of Syracuse regarding the constitutionality of Syracuse City Ordinance 16-2; (7) a *Monell* claim against the City of Syracuse regarding the hiring, supervising, and training of officers; and (8) a state law respondeat superior claim against the City of Syracuse.  (Dkt. No. 1 ¶¶14, 18-37.)  Plaintiff requests compensatory damages, punitive damages, attorney fees, costs, and "such other and further relief as may be just and proper under the circumstances, including but not limited to appropriate injunctive relief."  *Id*. at 6.

Defendants moved to dismiss the complaint.  (Dkt. No. 19.)  Defendants argued that the complaint did not comply with Federal Rule of Civil Procedure 8(a)(2) because it set forth only conclusory allegations, that several officers should be dismissed because the complaint did not indicate that they were personally involved in the incident, and that any claims against the officers in their official capacities should be dismissed.  *Id*.  The Court denied Defendants' motion to dismiss on May 17, 2011, but dismissed the claims against Officers Carns, Cope, Novitsky, and Tassini with Plaintiff's consent.  (Dkt. No. 21.)

Defendants now move for summary judgment.  (Dkt. No. 33.)  Plaintiff has opposed the motion.  (Dkt. Nos. 38-42.)  Defendants have filed a reply.  (Dkt. No. 45.)

## II.   APPLICABLE LEGAL STANDARDS

### A.   Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986).  Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material[13] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

### B.   Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion

---

[13]     A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248.

is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of

Civil Procedure 12(b)(6).  As a result, "[w]here appropriate, a trial judge may dismiss for failure

to state a cause of action upon motion for summary judgment."  *Schwartz v. Compagnise Gen.*

*Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968) (citations omitted); *accord*, *Katz v. Molic*, 128

F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that . . . a conversion [of a Rule 56

summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or

without notice to the parties.").  Accordingly, it is appropriate to summarize the legal standard

governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure

12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted.

 In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*,

"a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R.

Civ. P. 8(a)(2).  The requirement that a plaintiff "show" that he or she is entitled to relief means

that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is *plausible* on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added).  "Determining whether a

complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial

experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to

infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not

shown -- that the pleader is entitled to relief."  *Id.* at 1950 (internal citation and punctuation

omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the

10

material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949.

## III.    ANALYSIS

### A.    Constitutionality of City Ordinance § 16-2

Plaintiff was initially placed under arrest for violating Syracuse City Ordinance § 16-2, Disorderly Crowds.  (Dkt. No. 33-12 at 6:8-24.)  That ordinance states that "[p]ersons shall not collect in bodies or crowds in the streets or on the sidewalks for an unlawful purpose, or for any purpose to the annoyance or disturbance of citizens."  The complaint alleges that the ordinance is unconstitutionally vague and unenforceable.[14]  (Dkt. No. 1 ¶ 30.)  Defendants' moving papers do not address this claim.  (Dkt. No. 33-15.)  Plaintiff's opposition papers focus largely on the issue. (Dkt. No. 42 at 3-5.)  Defendants' reply papers address Plaintiff's arguments.  (Dkt. No. 45-1 at 5-7.)

Plaintiff argues that § 16-2 is unconstitutionally vague under *Coates v. City of Cincinnati*, 402 U.S. 611 (1971).  (Dkt. No. 42 at 4-5.)  In *Coates*, the Supreme Court examined a loitering ordinance that made it a criminal offense for "three or more persons to assemble on any of the sidewalks and there conduct themselves in a manner annoying to persons passing by."  *Coates*, 402 U.S. at 611 (punctuation omitted).  Three individuals convicted under the ordinance appealed to the Supreme Court, arguing that the ordinance was facially unconstitutional.  *Id*. at

---

[14]    The complaint does not allege that the ordinance is overbroad.

612.  The Court agreed, finding the ordinance both unconstitutionally vague and

unconstitutionally overbroad.  The Court stated that the "ordinance is unconstitutionally vague

because it subjects the exercise of the right of assembly to an unas[c]ertainable standard, and

unconstitutionally broad because it authorizes the punishment of constitutionally protected

conduct."  *Id*. at 614.  Regarding vagueness, the Court explained that:

> Conduct that annoys some people does not annoy others.  Thus, the
> ordinance is vague, not in the sense that it requires a person to
> conform his conduct to an imprecise but comprehensible normative
> standard, but rather in the sense that no standard of conduct is
> specified at all.  As a result, men of common intelligence must
> necessarily guess at its meaning.

> It is said that the ordinance . . . encompass[es] many types of conduct
> clearly within the city's constitutional power to prohibit.  And so,
> indeed, it is.  The city is free to prevent people from blocking
> sidewalks, obstructing traffic, littering streets, committing assaults,
> or engaging in countless other forms of antisocial conduct.  It can do
> so through the enactment and enforcement of ordinances directed
> with reasonable specificity toward the conduct to be prohibited.  *It
> cannot constitutionally do so through the enactment and enforcement
> of an ordinance whose violation may entirely depend upon whether
> or not a policeman is annoyed.*

*Id*. at 614 (citations omitted) (emphasis added).

The Court also found that the statute was unconstitutional because it violated the

constitutional right of free assembly and association.  *Id*. at 615.  The Court stated that:

> The First and Fourteenth Amendments do not permit a State to make
> criminal the exercise of the right of assembly simply because its
> exercise may be 'annoying' to some people If this were not the rule,
> the right of the people to gather in public places for social or political
> purposes would be continually subject to summary suspension
> through the good-faith enforcement of a prohibition against annoying
> conduct.  And such a prohibition, in addition, contains an obvious
> invitation to discriminatory enforcement against those whose

> association together is 'annoying' because their ideas, their lifestyle, or their physical appearance is resented by the majority of their fellow citizens.

*Id*. at 615-616.

Plaintiff argues that § 16-2 "is nearly identical to the ordinance that was declared unconstitutional in *Coates* . . . The wording regarding the annoyance is similar and should be declared unconstitutional for the same reasons set forth and relied upon in *Coates*." (Dkt. No. 42 at 4-5.)

In their reply papers, Defendants argue that

> Plaintiff's reliance on *Coates* is misplaced. In *Coates*, the appellants had their convictions for violating an ordinance affirmed by the Supreme Court of Ohio. On appeal to the United States Supreme Court the issue before the court was whether the Cincinnati ordinance was constitutional on its face. Plaintiff argues that the Court in *Coates* held "that this ordinance was vague because conduct, which annoys some people, does not annoy others and therefore men of common intelligence would have to guess at the meaning of the ordinance." However, the holding in *Coates* was much narrower. The Court held that the ordinance was "unconstitutionally vague because it subjects the exercise of the right of assembly to an unascertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct." Here, Plaintiff is not seeking to overturn a conviction where he was exercising his First Amendment right to association or assembly.

> More importantly, Section 16-2 of the Revised General Ordinances, General Prohibitions against disturbance of the public peace and quiet, explicitly states "persons shall not collect in bodies or crowds in the streets or on the sidewalks for any unlawful purpose, or for any purpose to the annoyance or disturbance of citizens." The use of the phrase "unlawful purpose" in the city of Syracuse's ordinance could easily fall under "antisocial conduct," which as the Court in *Coates* explicitly stated, "The city is free to prevent people from blocking sidewalks, obstructing traffic, littering streets, committing assaults, or engaging in other forms of antisocial conduct."

> As such, Plaintiff's cases are not applicable to the present litigation.

> Plaintiff attempts to use cases centered on criminal conviction appeals to support his claims for civil liability on an unchallenged ordinance at the time of his arrest. Moreover, there is no evidence in the record that this ordinance was ever declared unconstitutional before Plaintiff's arrest.

(Dkt. No. 45-1 at 6-7.)

Defendants thus appear to argue that Plaintiff does not have standing to challenge the constitutionality of § 16-2 because he was not convicted of violating the ordinance. Defendants' argument is without merit. *See Naprstek v. City of Norwich*, 545 F.2d 815, 817 (2d Cir. 1976) (minors and their parents had standing to challenge constitutionality of curfew ordinance which had been applied to and enforced against person under circumstances identical to those in which the plaintiffs found themselves at the time of bringing the action, even though none of the plaintiffs had been arrested or fined or threatened with arrest or a fine); *Chapin v. Town of Southampton*, 457 F. Supp. 1170, 1172 (E.D.N.Y. 1978) (individual who had been arrested for nude sunbathing in violation of local ordinance had standing to challenge constitutionality of ordinance, even though charges had been dismissed). Here, Plaintiff was arrested for violating the ordinance. There is no indication in the record before the Court that the City of Syracuse intends to stop enforcing the ordinance. Therefore, Plaintiff has standing to challenge the ordinance.

Defendants argue that § 16-2 is distinguishable from the ordinance discussed in *Coates* because it prohibits loitering for "an unlawful purpose." Section 16-2 would likely not be constitutionally infirm if it simply read "[p]ersons shall not collect in bodies or crowds in the streets or on the sidewalks for any unlawful purpose." However, the ordinance does not end there. It continues: "*or* for any purpose to the annoyance or disturbance of citizens." Thus, an

14

individual may violate § 16-2 if he or she is perceived to have an annoying or disturbing purpose, even if everyone involved concedes that the purpose is lawful.  The ordinance does not define what the terms "annoying" or "disturbing" mean.  As the Supreme Court noted in *Coates*, what is unremarkable to one person may be annoying or disturbing to another.  This is precisely the type of vagueness that the Supreme Court rejected as unconstitutional in *Coates*.  Vague ordinances are subject to arbitrary and possibly discriminatory enforcement.

For these reasons, Defendants are not entitled to summary judgment of this claim. Plaintiff has not requested summary judgment on this claim.   Therefore, the claim will proceed forward, possibly to be resolved through pretrial motions.  The Court will conduct a telephone conference as soon as possible to discuss this issue and to schedule a trial date.

**B.      42 U.S.C. § 1983 Excessive Force Claim**

1.    Merits

Plaintiff claims that Defendants Fura, Summers, and Patti violated his civil rights by subjecting him to excessive force.[15]  (Dkt. No. 1 ¶¶ 14(c), 18-19.)  Defendants move for summary judgment of this claim,[16] arguing that the force they used was objectively reasonable under the circumstances.  (Dkt. No. 33-15 at 11-12.)  Plaintiff argues that (1) no force was reasonable under the circumstances because the officers arrested him for violating an unconstitutional ordinance; or (2) summary judgment is not appropriate because reasonableness is a question of

---

[15]      The complaint does not use the phrase "excessive force," but asserts that the individual defendants violated Plaintiff's "rights under the Fourth and Fourteenth Amendments . . . to be free from an unreasonable search and seizure of his person [resulting in] physical injuries to his person."  (Dkt. No. 1 ¶ 14.)  The Court has construed this as an excessive force claim.

[16]      Defendants address the merits of the excessive force claim despite stating that "the complaint does not reveal a cause of action for excessive force."  (Dkt. No. 33-15 at 11.)

fact.  (Dkt. No. 42 at 8.)

            a.     *Legal Standard*

"The Fourth Amendment protects individuals from the government's use of excessive force while detaining or arresting individuals."  *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (citing *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999)).  "When determining whether police officers have employed excessive force in the arrest context, the Supreme Court has instructed that courts should examine whether the use of force is objectively reasonable 'in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motivation.'"  *Jones*, 465 F.3d at 61 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)) (punctuation omitted).  Among the most relevant facts and circumstances are (1) the severity of the crime allegedly committed; (2) the threat of danger to the officer and society; and (3) whether the suspect was resisting or attempting to evade arrest.  *Thomas*, 165 F.3d at 143.  Reasonableness is generally a question of fact.  *See McKelvie v. Cooper*, 190 F.3d 58 (2d Cir. 1999) (reversing magistrate judge's grant of summary judgment to officers of Fourth Amendment excessive force claim).

            b.     *Defendant Fura*

In analyzing Plaintiff's excessive force claims, the Court is faced with a curious record because Plaintiff has no memory of his encounter with the police.  Despite this oddity, the undisputed evidence shows that when Defendant Fura used force on Plaintiff , Plaintiff was suspected only of violating § 16-2.  There is no evidence in the record that Defendant Fura believed that Plaintiff was armed or was otherwise a threat of danger to the officers or society.  On the other hand, it is undisputed that Plaintiff ran away and did not stop when officers shouted

16

at him.  By his own testimony, Defendant Fura responded to Plaintiff's non-violent offense, lack

of threat to the officers or society, and flight by grabbing Plaintiff and punching him in the jaw.

(Dkt. No. 33-12 at 6:8-24.)  A reasonable juror could find that Defendant Fura's actions were

reasonable in light of Plaintiff's flight.  Another reasonable juror could find that Defendant

Fura's reaction was not reasonable in light of the minimal offense that Plaintiff had allegedly

committed and the fact that Plaintiff was unarmed and had not threatened to hurt the officers or

any other individuals.  Thus, a question of triable fact exists as to whether Defendant Fura used

excessive force.

c.  <em>Defendant Summers</em>

Defendant Summers testified that when he arrived on the scene, Plaintiff was on the

ground resisting Defendant Fura.  (Dkt. No. 33-10 at 10:11-16.)  When Plaintiff disregarded a

verbal order to place his hands behind his back, Defendant Summers struck Plaintiff's shoulders

twice, with one blow bouncing off of Plaintiff's shoulder and cutting his eyebrow.  <em>Id</em>. at 10:16-

21.  As noted above, this is the only evidence in the record regarding the encounter between

Defendant Summers and Plaintiff because Plaintiff does not remember the incident.  A

reasonable juror could not conclude that Defendant Summers acted unreasonably.  Therefore, the

excessive force claim against Defendant Summers is dismissed.

d.  <em>Defendant Patti</em>

The complaint does not allege that Defendant Patti used any force against Plaintiff.  (Dkt.

No. 1.)  Plaintiff's opposition papers do not discuss any use of force by Defendant Patti.  (Dkt.

No. 42.)  Defendants assert that Defendant Patti "was not in any manner involved in the

circumstances involved with Plaintiff's arrest."  (Dkt. No. 33-15 at 1.)  The evidence before the

17

Court shows that Defendant Patti, among others, chased Plaintiff, yelling at him to stop and that he was under arrest.  (Dkt. No. 33-14 ¶ 13; Dkt. No. 39 ¶ 1.)  Plaintiff testified at his 50-h hearing that "it felt like I was being electrocuted . . . So I must have been tased by . . . an officer" and at his deposition that he believed he had been tased because his whole body shut down, but that he does not remember when that happened.  (Dkt. No. 33-8 at 23:23-24:18; Dkt. No. 33-9 at 17:9-15.)  Defendant Patti testified at his deposition that he was armed with a taser but that he did not use it.  (Dkt. No. 33-11 at 21:3-22:1.)

This evidence is insufficient to raise a triable issue of fact that Defendant Patti used any force against Plaintiff because it is entirely dependent on Plaintiff's own extremely incomplete testimony. In general, of course, "[c]redibility determinations . . . are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.  *See also Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").  There is, however, a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005); *Blake v. Race*, 487 F. Supp. 2d 187, 202 (E.D.N.Y. 2007).  In *Jeffreys*, the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys*, 426 F.3d at 554.

In *Jeffreys*, the plaintiff, who alleged that police officers beat him and threw him out a window, confessed on at least three occasions that he had jumped out of a third-story window rather than having been thrown. *Id.* at 552.  The plaintiff did not publicly state that he had been

18

thrown out of a window by police officers until *nine months* after the incident. *Id*. The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.*

The *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony. In *Jeffreys*, for instance, one of the arresting officers declared that, contrary to the plaintiff's version of events, he was the only officer who entered the room where the plaintiff was allegedly beaten and that he saw the plaintiff jump out the open window. *Jeffreys*, 426 F.3d at 551-52.

Here, Plaintiff testified that he "must have" been tased by "an officer." This incomplete testimony is contradicted by testimony by Defendant Patti, the only defendant who was armed with a taser, that he did not use his taser. No reasonable juror could credit a claim that Defendant Patti used force on Plaintiff. Indeed, as noted above, it is not even clear that Plaintiff *alleges* that Defendant Patti used force. Therefore, the excessive force claim against Defendant Patti is dismissed.

### 2.   Qualified Immunity

Defendants argue that even if the court finds that Defendant Fura used excessive force, he is entitled to qualified immunity. (Dkt. No. 33-15 at 12.)

The qualified immunity inquiry generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton*, 380 F.3d 57, 68-69 (2d Cir. 2004) (citations omitted), *accord*, *Higazy v. Templeton*, 505 F.3d 161, 169, n.8 (2d Cir. 2007) (citations omitted).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in the Second Circuit consider three factors: (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) (citations omitted), *cert. denied*, 503 U.S. 962 (1992).

In the excessive force context "the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force was objectively reasonable in light of the circumstances." *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995).  In excessive force cases, then, the analysis "converge[s] on one question: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed would be lawful." *Cowan v. Breen*, 352 F.3d 756, 764 n.7 (2d Cir. 2003) (citation omitted).

If the facts showed that Defendant Fura merely grabbed Plaintiff to stop him from running, or even that he pushed Plaintiff to stop his flight, the Court would have no difficulty concluding that Defendant Fura was entitled to qualified immunity.  However, the Court is unable to conclude as a matter of law that a reasonable officer would believe that punching a fleeing, non-violent suspect in the jaw would be lawful.  Therefore, the excessive force claim against Defendant Fura will proceed to trial.

### C.     False Arrest Claim

Plaintiff alleges that Defendants Summers, Fura, and Patti violated his Fourth Amendment rights by subjecting him to "an unreasonable search and seizure of his person" and

20

the "loss of his physical liberty."  (Dkt. No. 1 ¶ 14.)  Defendants move for summary judgment of this claim.  (Dkt. No. 33-15 at 9-10.)

The elements of a Fourth Amendment false arrest claim under 42 U.S.C. § 1983 are the same as those for a false arrest claim under New York law.  *Kraft v. City of New York*, 696 F. Supp. 2d 403, (S.D.N.Y. 2010).  "To state a claim for false arrest under New York law, a plaintiff must show that (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged."  *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (punctuation and citation omitted). Where an officer has probable cause to arrest a plaintiff, the confinement is privileged.  *Id*. at 76.  The burden of showing that there was probable cause for the arrest is on the officer.  *Id*.

Defendants argue that Plaintiff cannot establish that he was falsely arrested because  he was not aware of his confinement.  (Dkt. No. 33-15 at 9-10.)  Plaintiff's opposition papers do not address this argument.[17]  (Dkt. No. 42.)  It is undisputed that Plaintiff lost consciousness before Defendant Fura arrested him and did not regain consciousness until he was in the hospital.  (Dkt. No. 33-14 ¶ 24; Dkt. No. 39 ¶ 1.)  Thus, Plaintiff was not conscious of the confinement. Therefore, Defendants' motion for summary judgment dismissing this claim is granted.

---

[17]      Regarding the false arrest claim, Plaintiff argues that Defendants did not have probable cause to arrest him because §16-2 is unconstitutionally vague.  (Dkt. No. 42 at 6.) Plaintiff's argument is without merit.  *See Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979) ("Police are charged to enforce laws until and unless they are declared unconstitutional . . . Society would be ill-served if police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement.").

**D.      City of Syracuse's Liability for Excessive Force and False Arrest**

Plaintiff claims that the City of Syracuse is liable for any constitutional torts committed by the individual Defendants because it failed to exercise reasonable care in hiring its officers, inadequately supervised its officers, and inadequately trained its officers.  (Dkt. No. 1 ¶¶ 32-34.) Defendants move for summary judgment of this claim.  (Dkt. No. 33-15 at 14-16.)  As Defendants correctly note (Dkt. No. 45-1 at 2), Plaintiff's opposition (Dkt. No. 42) does not address this argument.

In order "to hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to . . . prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983).  An "official policy or custom" can be shown in several ways: (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question; (3) a practice so consistent and widespread that it constitutes a custom or usage sufficient to impute constructive knowledge of the practice to policymaking officials; and (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come in contact with the municipal employees.  *Dorsett-Felicelli v. C'nty of Clinton*, 371 F. Supp. 2d 183, 194 (N.D.N.Y. 2005) (citing *Monell*, 436 U.S at 690, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986), and *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

The record does not disclose any evidence that any official policy or custom of the City of Syracuse led to any deprivation of Plaintiff's constitutional rights.  Therefore, Defendants'

22

motion for summary judgment dismissing this claim is granted.

### E.   State Law Claims

#### 1.   Negligence

Plaintiff alleges that Defendants Patti, Fura, and Summers were negligent.  (Dkt. No. 1 ¶¶ 25-27.)  Defendants move for summary judgment of this claim, arguing that it is barred because Plaintiff did not mention negligence in the Notice of Claim he filed with the City of Syracuse. (Dkt. No. 33-15 at 13.)  As Defendants correctly note (Dkt. No. 45-1 at 2), Plaintiff's opposition (Dkt. No. 42) does not address this argument.

New York General Municipal Law Section 50-e requires plaintiffs to submit a notice of claim to a municipality prior to bringing suit in court.  The purpose of the claim requirement is to allow the defendant municipality to conduct a proper investigation and assess the merits of the claim.  *Carhart v. Village of Hamilton*, 594 N.Y.S. 2d 358 (3d Dept. 1993).  A theory of liability not mentioned in the notice of claim cannot be asserted later in litigation.  *Olivera v. City of New York*, 704 N.Y.S. 2d 42 (1st Dept. 2000).  Here, Plaintiff's notice of claim to the City of Syracuse mentions  "[f]alse arrest, false imprisonment, excessive force, police brutality, violation of claimant's civil rights, and assault."  (Dkt. No. 33-5.)  It does not mention negligence.  Therefore, Defendants' motion for summary judgment dismissing Plaintiff's negligence claim is granted.

#### 2.   False Imprisonment

Plaintiff alleges that Defendants Patti, Fura, and Summers falsely imprisoned him.  (Dkt. No. 1 ¶¶ 20-22.)  For the same reasons discussed above regarding Plaintiff's constitutional false arrest claim, Defendants' motion for summary judgment dismissing this claim is granted.

3.     Assault

Plaintiff alleges that Defendants Fura and Summers assaulted him.  (Dkt. No. 1 ¶¶ 23-24.)

Defendants move for summary judgment dismissing this claim, arguing that the officers used

only necessary force and that, even if they used unreasonable force, they are entitled to qualified

immunity.  (Dkt. No. 33-15 at 11-12.)

"[T]he test for whether a plaintiff can maintain . . . a cause of action against law

enforcement officials [for assault and battery] is whether the force used was 'reasonable,' the

exact same test as the one used to analyze a Fourth Amendment excessive force claim."  *Hogan*

*v. Franco*, 896 F. Supp. 1313, 1315 n.2 (N.D.N.Y. 1995).  Here, as discussed above, there is a

triable issue of fact as to whether Defendant Fura used reasonable force but the undisputed facts

show that Defendant Summers used reasonable force.  Thus, the undisputed facts raise a triable

issue of fact that Defendant Fura assaulted Plaintiff.  Additionally, for the reasons discussed

above regarding Plaintiff's constitutional excessive force claim, the Court cannot find as a matter

of law at this time that Defendant Fura is entitled to qualified immunity.  *Jones*, 465 F.3d at 63.

Therefore, Defendants' motion for summary judgment of Plaintiff's state law claim for assault is

granted as to Defendant Summers but denied as to Defendant Fura.

4.     *Respondeat Superior*

Plaintiff claims that the City of Syracuse is liable under the theory of *respondeat superior*

for Defendant Fura's alleged assault of Plaintiff.  (Dkt. No. 1 ¶¶ 36-37.)  Defendants do not

address this claim in their motion for summary judgment, presumably relying on their substantive

arguments regarding the individual Defendants to relieve the City of liability. Cities may be held

vicariously liable for state law torts committed by police officers under a theory of *respondeat*

24

*superior*.  *See Williams v. City of White Plains*, 718 F. Supp. 2d 374, 381 (S.D.N.Y. 2010).

Therefore, the *respondeat superior* claim against the City of Syracuse regarding Defendant

Fura's alleged assault of Plaintiff will proceed to trial.

      **ACCORDINGLY**, it is hereby

      **ORDERED** that Defendants' motion for summary judgment (Dkt. No. 33) is

**GRANTED IN PART AND DENIED IN PART**.  The motion is granted as to all causes of

action *except* (1) the claim against the City of Syracuse regarding the constitutionality of

Ordinance § 16-2; (2) the excessive force claim against Defendant Fura; (3) the assault claim

against Defendant Fura; and (4) the *respondeat superior* claim against the City of Syracuse

regarding Defendant Fura's use of force.  Those claims will proceed to trial; and it is further

      **ORDERED** that a telephone conference be scheduled at the earliest possible convenience

of the Court and the parties to schedule a trial date.

Dated: December 22, 2011
      Syracuse, New York

                                  George H. Lowe
                                  United States Magistrate Judge